JaFITZSIMMONS, Judge.
In the fall of 1992, Appellant, Livingston Downs Racing Association, applied to the Louisiana State Racing Commission (Commission) for a permit to conduct live horse racing and to be licensed as an offtrack wagering facility. The Commission declined to place Louisiana Downs’ application for an offtrack wagering facility on the agenda. Livingston Downs was effectively denied a license to operate an offtrack wagering facility. Having been denied a license, Livingston Downs brought this suit for declaratory judgment and injunctive relief against the Governor, the Attorney General, the Secretary of the Department of Economic Development, the Chairman of the Louisiana State Racing Commission, and the District Attorney for the Parish of Livingston. Livingston Downs asked the trial court to declare La.R.S. 4:211 (5 and 7) and 4:214(A)(1) unconstitutional. Additionally, Livingston Downs requested that a permanent injunction be issued against the Commission enjoining them from enforcing the law and regulations under the applicable offtrack wagering statutes. Soon after Livingston Downs filed suit, the Fair Grounds Corporation (Fair Grounds) intervened, naming Livingston Downs as defendant-in-intervention.
A hearing on the petition for injunc-tive relief and for declaratory judgment was held on October 29, 1993. The trial court took the matter under advisement. On November 19, 1993, the trial court issued written reasons denying Livingston Downs’ request for injunctive relief. A judgment was signed by the trial court on December 8, 1993.[1]
IsOn January 19, 1994, the Fan-Grounds filed a motion for summary judgment. The Commission joined in the motion. The prayer for relief in the motion for summary judgment requested the court to dismiss Livingston Downs’ claims and again *1314 rule on the constitutionality of the challenged statutes. The trial court granted the motion for summary judgment on April 12,1994, and signed a judgment on April 18, 1994. The court’s ruling on the summary judgment addresses the same exact issues as those presented to the court on the original petition for injunctive relief. Oddly, a second judgment on the same motion for summary judgment was signed on April 26, 1994.[2]
Livingston Downs is seeking review of the trial court’s rulings on the petition for injunc-tive relief and summary judgment. In its appeal, Livingston Downs assigns as error the trial court’s failure to recognize that certain provisions of the offtrack wagering law make it internally inconsistent. Also assigned as error is the trial court’s failure to find that La.R.S. 4:211(5 & 7) and 4:214(A)(1) are special laws, in violation of the Louisiana Constitution, Article 3, Section 12, and/or that the statutes deprive Livingston Downs of the protections afforded by the First and Fourteenth Amendments of the United States Constitution.
The intent of the legislature in enacting the horse racing statutes is set forth in La. R.S. 4:141 and 4:142. Those sections provide in pertinent part:
§ 141 Legislative intent and policy.
It is the policy of the state of Louisiana in furtherance of its responsibility to provide revenues for the operation of state government for its people, to acknowledge and declare that the providing of funds and financial assistance to licensed horse racing tracks in |4the state of Louisiana constitutes an authorized public function and purpose of the state of Louisiana ...;
(1)To institute and maintain a program to encourage and permit development of the business of horse racing with pari-mutuel wagering thereon on a high plane.
(2)To institute and maintain a program to encourage and permit development of the breeding and ownership of race horses in the state.
§ 142 Purpose.
It is the purpose of this Chapter to effectuate the policies set forth in R.S. 4:141 by providing for:
(1) A program to permit maximum development of the business of horse racing with pari-mutuel wagering thereon.
(2) A program to permit maximum development of the breeding and ownership of race horses in this state.
Ordinarily, legislative intent is, at best, a signpost for interpretation. Here, the intent forms part of the statute itself. At the time the statutes were passed, the five parimutuel facilities licensed to conduct live horse racing were facing a decline in racing revenues. The number of “on track” patrons was dying out. The horse racing statutes were enacted as a means of protecting and preserving live horse racing. The preservation of “five racing” meant that the breeding industry would also continue to exist. With that breeding industry, other businesses are spawned: such as veterinary services, fencing construction workers, feed suppliers, farriers, hot walkers, training facilities, and real estate sales and development.
Offtrack wagering was viewed as a means to secure additional revenue for those tracks in existence at the time the offtrack wagering statutes were enacted. Had Livingston Downs been in existence at that time, it too would have benefitted from the offtrack provisions of the law.
The pertinent provisions of the statutes at issue, La.R.S. 4:211(5 & 7) are as follows:
§ 211 Definitions:
*1315 Unless the context indicates otherwise, the following terms shall have the meaning ascribed to them below:
|s(5) “Pari-mutuel facility” means any pari-mutuel race track conducting race meetings during the 1986-87 racing season and licensed prior to the effective date of this Part.[3]
(7) “Primary licensee” means the licensed association conducting the majority of race days at a pari-mutuel facility.
§ 214 Offtrack wagering facilities; licensing; criteria; management; appeal of license suspension or revocation.
A. License approval shall be subject to the criteria established by R.S. 4:159. Li-censure shall be subject to the following conditions:
(1) Only the primary licensee operating at a pari-mutuel facility may apply for a license to operate offtrack wagering facilities in this state and only such primary licensees shall be licensed to operate offtrack wagering facilities under this Part.
(Amended by Acts 1990, No. 1013, § 1, eff. July 26, 1990.)
The effect of these statutes is that only primary licensees at pari-mutuel facilities, operating and licensed as of the 1986-87 racing season, are eligible to be licensed as offtrack wagering facilities. The provisions do not call for offtrack wagering to be available for any association which does not meet the criteria of La.R.S. 4:211 and La.R.S. 4:214.
Livingston Downs’ constitutional arguments focus on the exclusionary nature of the offtrack wagering statutes which prevents Livingston Downs from operating offtrack wagering facilities. Alternatively, Livingston Downs argues that the offtrack wagering statutes are internally inconsistent: La.R.S. 4:213 grants the right to own and operate offtrack wagering parlors to any racing association; La.R.S. 214(A)(1) and the definitions found at La.R.S. 4:211(5 & 7) prohibit Livingston Downs from operating offtrack wagering facilities. In consideration of our recent pronouncement in Bueto v. Video Gaming Div., 94-0334 (La.App. 1 Cir. 3/4/94), 637 So.2d 544, 547, constitutional issues should not be used to resolve disputes when they are resolvable by resolution of other issues. We will first address Livingston Downs’ contention that the statutes are internally inconsistent.
Livingston Downs argues that La. R.S. 4:213 specifically grants the right to own and operate offtrack wagering parlors to any association. Livingston Downs contends the definitions found in La.R.S. 4:211(5 & 7) are contrary to La.R.S. 4:213. The pertinent sections of La.R.S. 4:211 are cited above. La.R.S. 4:213 provides as follows, in pertinent part:
§ 213 Offtrack wagering facilities; establishment.
In addition to the rights granted in R.S. 4:149.2, any association licensed by the commission may accept and transmit wagers as provided in this Chapter and engage in all necessary activities to establish appropriate offtrack wagering facilities to accomplish this purpose....[4]
Livingston Downs submits that the definitions found at La.R.S. 4:211 place exclusionary conditions on those associations applying for a license after a certain period of time. Such exclusions deprive Livingston Downs of the right to own and operate offtrack wagering facilities, a right granted to any association under La.R.S. 4:213.
Livingston Downs suggests a statutory construction which would cure this internal inconsistency: the conflicting provisions should be construed as a grandfather clause. *1316 Under Livingston Downs’ statutory construction, those associations which were in operation for the 1986-1987 racing season are relieved from any further license requirements for the operation of offtrack wagering facilities, while a facility seeking licensure after the 1986-1987 season, would be subject to additional licensing criteria.
As defined in La.R.S. 4:211(5), a pari-mutuel facility is an association conducting racing during the 1986-1987 season and licensed prior to June 30, 1987. The rights granted to “any association licensed by the commission” in La.R.S. 4:213 are limited by the specific licensure requirements in La.R.S. 4:211. In construing La.R.S. 4:213, Livingston Downs would have this Court ignore La.R.S. 4:211(5). Livingston Downs’ proposed construction is a very strained interpretation of an otherwise 17elear statutory provision. When a proposed construction of a statutory provision renders one or more of its provisions nugatory or without effect, such proposal must be rejected. State v. Union Tank Car Company, Inc., 439 So.2d 377 (La.1983). Thus, we reject Livingston Downs’ proposed statutory construction.
We now address Livingston Downs’ contention that the offtrack wagering laws are unconstitutional as local or special laws pursuant to La. Const, art. Ill, Sect. 12. This section of the 1974 Louisiana Constitution provides in pertinent part:
Section 12 Prohibited Local and Special Laws
(A) Prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law:
(6) Regulating labor, trade, manufacturing, or agriculture; fixing the rate of interest.
(7) Creating private corporations, or amending, renewing, extending, or explaining the charters thereof; granting to any private corporation, association, or individual any special or exclu- . sive right, privilege, or immunity.
•Livingston Downs argues that the offtrack wagering laws grant to certain private corporations a “special or exclusive right” to operate offtrack wagering facilities. The Commission and the Fair Grounds counter that the act benefits the entire State, concerns the welfare of citizens residing in the entire State, concerns the welfare of citizens residing in the entire State, and addresses an issue of statewide concern.
Louisiana courts have defined special or local laws in a variety of ways. A myriad of principles have been adopted in determining whether particular legislation violates the “special or local law” prohibitions of the constitution. General laws have been defined as “those that operate equally and uniformly upon all persons brought within the relations and circumstances for which they provide, or that operate equally upon all persons of a designated class founded upon a reasonable and proper classification.” Polk v. Edwards, 626 So.2d 1128, 1134 (La.1993), citing Knapp v. Jefferson-Plaquemines Drainage Dist, 224 La. 105, 68 So.2d 774, 777 (1953). A statute is considered “special or local” if its restrictions can affect only a portion of the 1 gcitizens, or a fraction of the property embraced within the created classification. Davenport v. Hardy, 349 So.2d 858 (La.1977).
In Polk v. Edwards, supra, the Louisiana Supreme Court was called upon to determine whether the Casino Act, the Cruise Ship Act, the Riverboat Gaming Act, and the Video Poker Act were prohibited special laws. The Polk Court determined the acts at issue were general laws and therefore they were not unconstitutional. In reaching this decision, the Court placed particular emphasis on language found in State v. Dalon, 35 La.Ann. 1141 (1883). The Dalon Court too was called upon to decide whether a law was special or general. The Court stated at 35 La.Ann. at 1144:
The real distinction between public or general laws and local or special laws is that the former affect the community as a whole, whether throughout the State or one of its subdivisions; and the latter affect private persons, private property, private or local interests.
*1317 Addressing the same issue a few years later in State ex rel. Grosch v. New Orleans, 211 La. 241, 29 So.2d 778, 788 (1947), the Supreme Court stated:
The words ‘local’ or ‘special’ as used in ... the constitution have been declared in numerous eases to refer to such laws wherein private individuals are seeking some private advantage or advancement for the benefit of private persons or property within a certain locality.
In the present case, the horse racing statutes were enacted with the stated purpose of encouraging maximum development of the business of horse racing, including the breeding and ownership of race horses in the state of Louisiana.[5] The offtrack wagering and horse racing statutes are both contained within Title 4 of the Louisiana Revised Statutes, at Chapter 4, which is designated “Racing.”
Under the Louisiana scheme of statutory construction, La.R.S. 4:141 and 142 govern the racing statutes as a whole. Although the horse racing statutes were enacted prior to the offtrack wagering statutes, the legislature is presumed to have enacted each statute 19with deliberation and with full knowledge of all existing laws on the same subject. Hayden v. Richland Parish School Board, 554 So.2d 164, 167 (La.App. 2d Cir. 1989), writ denied, 559 So.2d 124 (La.1990). The meaning and intent of both the horse racing and the offtrack wagering statutes, therefore, is to be determined by a consideration of the Racing statutes in their entirety and all other laws on the same subject matter. A construction should be placed on the provisions in question which is consistent with the express terms of the statute and with the obvious intent of the legislature in enacting them. Licensing Board v. Dept. of Agriculture, 588 So.2d 1268, 1273 (La.App. 1 Cir.1991), writ denied, 590 So.2d 598 (La.1992); Hayden, 554 So.2d at 167.
A problem similar to that before this Court, regarding statutory construction, was presented to the Supreme Court in Gandolfo v. Louisiana State Racing Commission, 227 La. 45, 78 So.2d 504 (La.1954). There, the Court interpreted an earlier version of the racing statutes which are presently at issue. In considering the constitutionality of certain sections of the horse racing statutes in light of the criminal gambling statute, the Supreme Court held, La.R.S. 14:90 and R.S. 4:141 to 4:161 must be construed together, as they are part of one legislative act. Gandol-fo, 78 So.2d at 508. Furthermore, citing State ex rel. Fudickar v. Heard, 223 La. 127, 65 So.2d 112, 114-115 (La.1953), the Court in Gandolfo explained:
It is to be remembered that the Revised Statues constitute a single act of the legislature, adopted as a whole; different sections should be regarded not as separate acts, but as simultaneous expressions of the legislative will, and all provisions should be construed together and reconciled whenever possible.
Accordingly, we construe the horse racing statutes and the more recently enacted offtrack wagering statutes as part of a single act of the legislature. We find the articulated purpose of the former statutes to be shared by the latter, and by all other statutes found in the same chapter on the same subject matter.
On its face, the offtrack wagering statutes do affect the citizens of the State of Louisiana as a whole, and seemingly achieve the stated purpose of the horse racing statutes. However, hothe testimony adduced at the trial on the preliminary injunction indicates otherwise. Mr. Al J. Ransome, Chairman of the Board of Livingston Downs Association, testified that without the ability to operate offtrack wagering facilities in connection with a parimutuel facility, a racing association simply cannot compete with those associations which are allowed to operate offtrack wagering facilities. The testimony further indicated that the offtrack wagering *1318 business generated, for the corporate owners of a pari-mutuel facility, a greater portion of the profits than that generated by the live handle.
Although the racing statutes’ intent, as a whole, is to promote live horse racing, which should benefit all citizens of the State of Louisiana, it is not clear that the offtrack wagering statutes actually accomplish that purpose. Since only certain associations licensed under the statute are granted the privilege and advantage of operating offtrack wagering facilities, it appears that the statute affects only a limited number of private persons or corporations. Thus, the offtrack wagering law appears to benefit a very exclusive class. When a statute grants immunities or advantages to a special class against the general public ... the claims of the grantee should be strictly construed. Rodriguez v. Louisiana Medical Mut. Ins., 618 So.2d 390, 394 (La.1993).
In order to comprehensively determine whether the offtrack wagering laws are special laws, contrary to the provisions of the Louisiana Constitution, additional evidence is required. Statistics should be presented to the trial court to show the earnings attributable to the offtrack wagering facilities which are actually received by the horsemen themselves, and/or directly funnelled into the development of the breeding and ownership of race horses in the State. These statistics should contrast, as accurately as possible, those earnings attributable to the offtrack wagering facilities, which earnings are received by the owners of the pari-mutuel facilities.
Therefore, we find that while the immediate objective sought to be achieved in the offtrack wagering laws may be general in | ncharacter, the law as applied appears to be specific, and in derogation of La. Const, art. Ill, Sect. 12. We reverse the findings of the trial court on the application for injunctive relief, and on the motion for summary judgment, and remand this matter for the taking of additional evidence which will show who are the actual beneficiaries of the offtrack wagering laws.
Because of our finding regarding the Louisiana Constitutional issue, it is unnecessary to consider whether the statutes in question are unconstitutional as a denial of freedom of commercial speech or equal protection. The trial court determination in this regard was inappropriate and is specifically voided as unnecessary. Trial and appellate costs in the total amount of $2,007.71 are to be shared equally between Appellee, State of Louisiana, and The Fair Grounds Corporation, Interve-nor-Appellee.
REVERSED AND REMANDED, WITH INSTRUCTIONS.
PITCHER and LeBLANC, JJ., concur in the result.

. This judgment is improperly dated November 8, 1993. Moreover, neither the judgment nor the reasons stated by the trial court contain a specific ruling on the plaintiff's motion for declaratory judgment. However, in its reasons, the trial court provided a generous discussion of the constitutionality of the challenged statutes and concluded that the statutes "pass constitutional muster." Where a trial court's judgment is silent with respect to a party’s claim, it is presumed the trial court denied the relief sought. Testa Distributing Co., Inc. v. Tarver, 584 So.2d 300, 303 (La.App. 1st Cir.1991). Accordingly, we find the motion for declaratory judgment was denied by the trial court.

. We find error in the trial court's consideration of the summary judgment filed on behalf of the Fair Grounds, as intervenor. The petition of the original plaintiff does not, make any claims against the Fair Grounds that would necessarily be dismissed in a summary judgment. Therefore, the court’s judgment on the motion for summary judgment is incorrect insofar as it attempts to dismiss nonexistent claims of a plaintiff against an intervenor. Abshire v. Hartford Accident and Indemnity Ins. Co., 289 So.2d 545, 550 (La.App. 3 Cir.) writ denied 293 So.2d 170 (La.1974). However, this error was harmless, as the trial court's ruling on the summary judgment was redundant.

. The effective date is June 30, 1987.

. R.S. 149.2 provides a definition of "other track wagering.” It is defined as simulcasting, or transmitting and receiving races from other race tracks while conducting a live race at a parimu-tual facility.

. La.R.S. 4:141 and 142, supra, contain specific provisions regarding the purpose of the horse racing statutes.