**UNITED STATES of America**
v.
**Jim GARRISON et al.**
Crim. A. No. 71–542.

United States District Court,
E. D. Louisiana.

Aug. 4, 1972.

Gerald J. Gallinghouse, U. S. Atty., East. Dist. of Louisiana, John Wall, Dept. of Justice, for the Government.

Louis B. Merhige, New Orleans, La., F. Lee Bailey, Mark Kadish, Boston, Mass., for Jim Garrison.

Milton P. Masinter, New Orleans, La., for Frederick A. Soule, Sr. and Robert N. Frey.

Guy Johnson and Philip J. Foto, New Orleans, La., for Louis M. Boasberg.

Lee C. Grevemberg, New Orleans, La., for Harby S. Marks, Jr.

Virgil M. Wheeler, Jr., New Orleans, La., for John Aruns Callery.

F. Irving Dymond, New Orleans, La., for John J. Elms, Jr.

Cecil M. Burglass and Lawrence L. Lagarde, Jr., New Orleans, La., for Lawrence L. Lagarde, Sr.

Louis C. LaCour and Gerald H. Schreiber, New Orleans, La., for Robert Nims.

Milton E. Brener, New Orleans, La., for John Elmo Pierce.

CHRISTENBERRY, District Judge.

This matter is before the court on defendants' numerous motions to dismiss, for severance, to suppress evidence, for discovery, and for other pretrial relief. On May 17, 1972, oral arguments were heard on some of these motions but with most motions being submitted by counsel on their extensive and thorough legal memoranda. The court herewith, for the reasons assigned below, rules on all currently pending motions, with all motions denied except as expressly granted.[1] The motions filed by most of the defendants asking that they be allowed to adopt the motions of their codefendants and file subsequent motions are granted and, accordingly, each motion or group of motions will be treated where applicable as though brought by all ten codefendants.

*Foreword*

The 14-page, one-count indictment in this case, which was returned by a special grand jury in this district on December 3, 1971, charges the ten defendants with conspiracy to obstruct the enforcement of the criminal laws of the state of Louisiana in violation of 18 U. S.C. § 1511 (1970). Three of the defendants were, at the time of their arrest on June 30, 1971, state or local law enforcement officials, *viz.*, Garrison, the District Attorney for the Parish of Orleans, and Soule and Frey, employees of the New Orleans Police Department with the ranks of captain and sergeant, respectively. Soule was assigned to Garrison's investigative staff and Frey was commander of the vice squad. The other seven defendants' relation to this case is through their ownership, direction, interest in, or employment by allegedly illegal gambling businesses.

## I. MOTIONS TO DISMISS THE INDICTMENT

*Constitutionality of 18 U.S.C. § 1511*

■ The defendants have moved to dismiss the indictment on the ground that the statute on which it is based, Title VIII, § 802(a) (codified at 18 U.S.C. § 1511 (1970)) of the Organized Crime Control Act of 1970 (P.L. 91-452), 84 Stat. 936, is unconstitutional. Section 1511 provides in pertinent part:

§ 1511. Obstruction of State or local law enforcement

(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—

(1) one or more of such persons does any act to effect the object of such a conspiracy;

(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

---

1. The court previously denied defendant Garrison's motion for recusal due to the legal insufficiency of movant's affidavit.

United States v. Garrison, 340 F.Supp. 952 (E.D.La.1972).

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) \* \* \*

(d) \* \* \*

As reasons for the provision's infirmity, defendants have variously asserted that section 1511 exceeds the powers granted to Congress under the commerce clause of the Constitution, that it in-

fringes upon powers reserved to the states by the Tenth Amendment, that it denies due process and equal protection guaranteed by the Fifth and Fourteenth Amendments, and that it is fatally vague, indefinite, and overbroad, in violation of the Fifth and Sixth Amendments. These contentions have been rejected by this and other federal courts that have upheld a similar provision of the same act, namely, Title VIII § 803(a), (codified at 18 U.S.C. § 1955 (1970)) of the Organized Crime Control Act of 1970 (P.L. 91–452), 84 Stat. 937.[2] United States v. Riehl, 460 F.2d 454 (3d Cir. 1972); Schneider v. United States, 459 F.2d 540 (8th Cir. 1972); United States v. Palmer, 465 F.2d 697 (6th Cir. 1972); United States v. Bally Manufacturing Corp., 345 F.Supp. 410 (E.D.La.1972); United States v. Iannelli, 339 F.Supp. 171, 180 (W.D.Pa.1972); United States v. Sacco, 337 F.Supp. 521 (N.D.Cal.1972); United States v. Aquino, 336 F.Supp. 737 (E.D.Mich.1972); United States v. Politi, 334 F.Supp. 1318, 1322 (S.D.N.Y.1971); United States v. Harris, 332 F.Supp. 315 (N.D. Tex.1971). Because this court concurs in both the logic and result reached in these cases, including *Riehl, supra,* which also expressly upheld the constitutionality of the provision under attack

---

2. Section 1955 provides in pertinent part as follows:

Section 1955. Prohibition of illegal gambling businesses

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

(d) \* \* \* \*

(e) \* \* \* \*

**1118**

here, I find section 1511 constitutional. Moreover, a brief examination of the defendants' contentions and the applicable jurisprudence will reveal that this is the only decision the court could properly reach.

■ The defendants contend primarily that Congress, in enacting section 1511, exceeded the powers granted to it under the commerce clause of the Constitution, U.S.Const. art. 1, § 8, cl. 3, and infringed upon the powers reserved to the states by the Tenth Amendment. This is so, they argue, because section 801 of Title VIII, in which "Congress finds that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof," relieves the government of the necessity of alleging and proving the effect on interstate commerce to establish a basis for federal jurisdiction. That this is the effect of section 801 cannot be doubted, but the defendants' conclusion that such a jurisdictional finding is invalid is incorrect. The Constitution expressly grants Congress plenary power over interstate commerce, U.S.Const. art. 1, § 8, cl. 18, and the Supreme Court has repeatedly held that Congress may exercise its power even over an intrastate class of activities that has "a substantial effect on interstate commerce." United States v. Darby, 312 U.S. 100, 119, 61 S.Ct. 451, 459, 85 L.Ed. 609 (1941). *See, e. g.,* Maryland v. Wirtz, 392 U.S. 183, 189, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 259, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Furthermore, it is well-settled that Congress may declare that a class of intrastate activities affects commerce, thereby obviating the necessity of proof of the effect, and, when Congress has

chosen to do so, "the only function of courts [in passing on the validity of such legislation] is to determine whether the particular activity regulated or prohibited is within the reach of the federal power." *Darby, supra,* 312 U.S. at 120–121, 61 S.Ct. at 460. Consistently, more recent Supreme Court decisions have emphasized that "where we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." Maryland v. Wirtz, *supra,* 392 U. S. at 190, 88 S.Ct. at 2020, *quoting* Katzenbach v. McClung, 379 U.S. 294, 303–304, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

■ Thus, to determine if section 1511 represents a valid exercise of Congress's power over interstate commerce, the sole inquiry this court may make is whether Congress had a rational basis for finding that illegal gambling businesses affect interstate commerce. The defendants contend that Congress must list its findings of effect on interstate commerce for its conclusion to be valid and, since there is no such proof in Title VIII of the Organized Crime Control Act of 1970, that this court is precluded from finding any rational basis.[3] But in Perez v. United States, 402 U.S. 146, 156–157, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971), a case that upheld a similar congressional finding of effect on interstate commerce in Title II of the Consumer Credit Protection Act, 82 Stat. 159 (codified at 18 U.S.C.A. § 891 (Supp.1972)), the Supreme Court, after examining the situation as presented to Congress, appropriately stated:

"*We do so not to infer that Congress need make particularized findings in order to legislate.* We relate the history of the Act in detail to answer the impassioned plea of petitioner that all

---

3. The defendants' reliance on United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), in support of this proposition is clearly misplaced. *Bass* involved statutory interpretation, and the Supreme Court expressly did not con-

sider the constitutionality of the statute involved and, hence, the relevance of Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). *Bass, supra,* 404 U.S. at 339, 92 S.Ct. 515, n. 4.

that is involved in loan sharking is a traditionally local activity." (Emphasis added.)

Although Congress did not state its findings, as, indeed, it was clearly not required to do under *Perez,* I find that the legislative history of section 1511 provides ample basis for the conclusion that illegal gambling affects interstate commerce.[4] The estimates of the scope of illegal gambling in the United States range from a low of $20 billion each year to a high of $50 billion, which, even at the lower figure, nets organized crime some $6 to $7 billion in annual profits. S.Rep.No.91–617, 91st Cong., 1st Sess. 71 (1969); Task Force Report: Crime and Its Impact—An Assessment, the President's Commission on Law Enforcement and Administration of Justice 52–53 (1967). These profits can in turn be used to supply the countless other illegal operations of organized crime such as loan sharking, the wholesale narcotics traffic, and the infiltration of legitimate businesses. *See* H.R.Doc.No.91–105, 91st Cong., 1st Sess. 6 (1969). There can be no doubt that such widespread and profitable activities involve the use of the instrumentalities of, and have a profound effect upon, interstate commerce. Nor can there be any doubt that these immense illegal gambling operations could not survive without the cooperation of some officials on the state and local level. Section 1511 does not purport to reach all illegal gambling operations in which local officials may be involved, but only those of a substantial size that operate on a regular basis. And, considering the size of illegal gambling in the United States and its connexity with some state and local officials, this court cannot say that Congress had no rational basis for finding that the class of activities proscribed by 18 U.S.C. § 1511 affects interstate commerce.

Defendants' Tenth and Fifth Amendment arguments must, likewise, be rejected because, if Congress has the power to regulate intrastate gambling activities under the commerce clause, as this court has found, it is not a power reserved to the states by the Tenth Amendment, and the application of section 1511 does not deprive the defendants of liberty or property in violation of the Fifth Amendment. *Heart of Atlanta Motel, Inc., supra,* 379 U.S. at 258–259, 85 S.Ct. 348. The court also rejects the defendants' contention that section 1511, by punishing gambling activities only in states where they are illegal, denies equal protection of the laws by creating an irrational discrimination. The accepted rule is simply that a variation in state law does not render a federal criminal statute, defined in terms of state laws, repugnant to the Fifth Amendment. United States v. Schwartz, 398 F.2d 464, 467 (7th Cir. 1968), cert. denied, 393 U.S. 1062, 89 S.Ct. 714, 21 L. Ed.2d 705 (1969); Spinelli v. United States, 382 F.2d 871, 890 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Turf Center, Inc. v. United States, 325 F.2d 793, 795–796 (9th Cir. 1963). Moreover, this and other federal tribunals have specifically rejected the argument presented here in cases involving 18 U.S.C. § 1955 (see note 2 *supra*), whose definition of illegal gambling is identical with that of section 1511 and whose initial application also depends upon state law. *Schneider, supra,* 459 F.2d at 542–543; *Bally Manufacturing Corp., supra,* 345 F.Supp. at 427; *Sacco, supra,* 337 F. Supp. at 527; *Aquino, supra,* 336 F. Supp. at 740.

The defendants finally claim that the definition of "illegal gambling business" contained in section 1511(b)(1) is unconstitutionally vague and overbroad. I

---

4. *See, e. g.,* S.Rep.No.91–617, 91st Cong., 1st Sess. 70–76 (1969); Hearings on S. 30, S. 974, S. 975, S. 976, S. 1623, S. 1624, S. 1861, S. 2022, S. 2122, and S. 2292 Before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary, 91st Cong., 1st Sess. 378–384 (1969); 116 Cong.Rec. 604 (1970) (Remarks of Senator Allott).

find that these contentions are without merit. Section 1511 specifically defines, in clear and precise terms, what Congress considered to be an illegal gambling business; it does not forbid "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Accord, Riehl, supra, 460 F.2d at 459. See also Bally Manufacturing Corp., supra, 345 F.Supp. at 427; Sacco, supra, 337 F.Supp. at 526–527.

Section 1511 in all respects represents a valid exercise of Congress's power over interstate commerce, and, accordingly, all motions to dismiss the indictment on the basis of its unconstitutionality are denied.

5. La.R.S. 14:90 (Supp.1972) provides in full:
 § 90. Gambling
 Gambling is the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit.
 Whoever commits the crime of gambling shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.

6. The basis of this allegation is paragraph D(3) of the indictment, which describes the roles of defendants Boasberg, Elms, Lagarde, Nims, and Pierce as, inter alia, owning and using the Bally "bingo" pinball machines on which "payoffs in cash and property woud be made" in violation of La.R.S. 14:90.

7. La.R.S. 47:375(E) (1970) provides in full:
 For the purpose of this Section a "coin-operated mechanical amusement device" is any machine or device, other than those described in Sub-sections E and F of this Section, operated by depositing a coin, token, slug, or similar object for the placing of the machine or device in readiness to play and which automatically scores or otherwise determines the result of the play, regardless of whether or not the machine or device is entirely automatic or mechanical in every phase of its operation. All

*Sufficiency of the Indictment*

■ The defendants have also moved to dismiss the indictment on the grounds that an erroneous interpretation of Louisiana law was presented to the grand jury. The only violation of state law alleged in the indictment is of La.R.S. 14:90 (Supp.1972) (Article 90 of the Louisiana Criminal Code),[5] which defines and proscribes "gambling." And the scope of La.R.S. 14:90 is of seminal importance because the existence of a business in violation of that statute, inter alia, must be properly alleged and proved before there is a violation of section 1511. See 18 U.S.C. § 1511(b)(1).

The gist of the defendants' argument is that the grand jury was led to believe that both cash and merchandise payoffs from Bally "bingo" machines were violations of La.R.S. 14:90;[6] that under La. R.S. 47:375(E) [7] and La.R.S. 15:31 [8]

such mechanical amusement devices and all machines or devices subject to tax under Sub-sections A, B and C of this Section, and which do not return to the operator or player thereof anything but free additional games or plays or which through the exercise of the skill of the operator or player, returns to the operator or player a merchandise prize, shall not be deemed to be or classed as gambling devices, and neither this Section nor any other Act shall be construed to prohibit same.

8. La.R.S. 15:31 (1967) provides in full:
 § 31. Confiscation and destruction of gambling devices; exceptions
 A. All officers of the State of Louisiana are hereby authorized and empowered and it is made mandatory and compulsory on their part to confiscate and immediately destroy all gambling devices or machines used for gambling that may come to their attention and that they may find in operation. The ownership of a federal gambling stamp for the machine or device shall be absolute proof of its use for purposes of gambling, except as set forth in Subsection B of this Section, and neither the State of Louisiana nor any subdivision, agency, agent, or enforcement officer shall be liable civilly or criminally for the destruction of any gambling device or gambling machine for which a federal gambling stamp has been issued.
 B. This Section shall not apply to any games, machines, or other devices, where

payoffs in merchandise are allowed, leaving only cash payoffs illegal; and, therefore, that the indictment is fatally defective, charging both legal and illegal acts, and should be dismissed. But an examination of the plain words and meaning of these statutes leads the court inexorably to the opposite conclusion.

Neither of the statutes cited by the defendants affect the prohibitory sweep of La.R.S. 14:90, the statute on which the indictment is based. La.R.S. 15:31 merely exempts from mandatory confiscation any machine that involves an element of *skill* and that does not provide an automatic cash payout. And La.R.S. 47:375(E) simply provides that the devices taxed by that statute shall not be deemed gambling devices when, through the exercise of *skill*, they return free games or merchandise prizes. It is clear that these statutes are not applicable when the payoff of merchandise is through an element of *chance* [9] and, therefore, that they do not exempt such machines from La.R.S. 14:90.

Moreover, this court's conclusion that merchandise payoffs from pinball machines involving an element of chance are within the prohibition of La.R.S. 14:90 is supported by the established jurisprudence of the State of Louisiana. In Gandolfo v. Louisiana State Racing Commission, 227 La. 45, 78 So.2d 504 (1954), the supreme court of this state considered Louisiana's various constitutional and statutory prohibitions against gambling, including La.R.S. 14:90 involved here. The clear language of the court unmistakably brought pinball machines within the prohibition of La.R.S. 14:90:

> "Lottery has been defined as a scheme for the distribution of prizes by lot or chance. It is upon that theory that this court has held slot machines, pinball machines and bank nites [*sic*] lotteries within the meaning of certain state statutes and city ordinances. State v. Barbee, 1937, 187 La. 529, 175 So. 50; City of New Orleans v. Collins, 1900, 52 La.Ann. 973, 27 So. 532; State v. Lasselle, 1923, 154 La. 168, 97 So. 389. . . ."

227 La. at 59, 78 So.2d at 509.

Since I have found that La.R.S. 14:90 prohibits gambling on gambling-type pinball machines where the payoffs are made in cash or merchandise, or both, and are determined by an element of chance, the grand jury's understanding of Louisiana's law was correct, and all motions to dismiss the indictment on this ground must be denied. The court also denies, as without merit, the defendants' other motions to dismiss the indictment on the grounds of vagueness and failure to state an offense against the United States. It is settled that in cases like the present one, where the gravamen of section 1511 is a violation of state law, the indictment need not describe in detail the state law or

---

there is no cash automatic payout and where there is an element of skill involved in the playing, including specifically coin-operated bowling games, shuffle alleys, pinball games, mechanical baseball games, electronic ray guns, mechanical guns, digger type machines, iron claws, and all similar types of coin-operated amusement games, as licensed under Subsections A, B, C, and E of R.S. 47:375.

9. Indeed, La.R.S. 47:375(F), and not (E), is more appropriately applied to the machines alleged to exist in this case. La.R.S. 47:375(F) provides in full:

> Every person engaged in the business of operating, or who permits to be operated in his place of business, any so called "slot" machine or similar machine or device which is operated by means of inserting or depositing a coin, token, slug, or similar object, or several of such, and which, by application of the element of chance, may deliver, or entitle the person playing or operating the machine or device to receive cash, premium, merchandise, or tokens, shall pay a tax of one hundred dollars for each such machine or device. Payment of the tax imposed by this Sub-section shall not be held to legalize the operation of any machine or device defined herein which is prohibited by law. This Sub-section shall not be held to repeal any provisions of any law prohibiting the operation, possession or use of any such machine or device.

the unlawful activity; it need only refer to state law "to identify the type of unlawful activity in which the defendants intended to engage." United States v. Karigiannis, 430 F.2d 148, 150 (7th Cir.), cert. denied, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970), *quoting* United States v. Rizzo, 418 F.2d 71, 74 (7th Cir. 1969). Further, for the indictment to state sufficiently an offense against the United States, it must contain all elements of the offense charged, clearly inform the defendants of what they will have to meet, and enable them to plead the judgment in bar as a defense to any future prosecution on the same offense. United States v. Debrow, 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953); Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932). I find that the indictment under attack here, which traces the statutory language of section 1511, amply meets these constitutional requirements, as well as the mandate of Rule 6(c), Federal Rules of Criminal Procedure.

### Alleged Grand Jury Irregularities

The defendants next urge numerous irregularities in the grand jury and its deliberations as further grounds for the dismissal of the indictment in this case. The motions taken together allege that an attorney for the United States Government was present during the deliberations in violation of Rule 6(d), Federal Rules of Criminal Procedure, that the jurors themselves were unduly biased and prejudiced because of improper pre-indictment publicity disseminated by the government, and that there was insufficient evidence presented to the grand jury to justify the charges against defendants Lagarde and Pierce. Furthermore, the defendants request an evidentiary hearing to examine the jurors to prove their bias and an *in camera* inspection of the grand jury minutes to show the insufficiency of the evidence. But finding these allegations to be baseless and conclusory, I must also deny these motions and requests of the defendants.

The sole basis of the first allegation is a sworn affidavit submitted with the motion by defendant Lagarde's attorney and simply stating that "he believes that government attorneys were present in the grand jury room while said jury was deliberating and voting on the indictment." And yet the affiant presented no factual evidence whatsoever to support the charge. Indeed, the United States Attorney for the Eastern District of Louisiana has submitted with the government memorandum, and in response to the defendant's charge, a sworn affidavit in which he avers that "no undue influence or improper tactics were exerted by himself or any other government attorney, that the indictment was read in its entirety to the grand jury prior to deliberations, and that no one other than the jurors was in the grand jury room while the jurors were deliberating or voting on the indictment." Clearly, no motion such as this may be granted when it is based on an unsubstantiated and contradicted affidavit. United States v. Calise, 217 F. Supp. 705, 709–710 (S.D.N.Y.1962); United States v. Brumfield, 85 F.Supp. 696, 705–706 (W.D.La.1949).

The basis of the defendants' assertion of prejudice and bias of the grand jurors is the allegedly prejudicial pre-indictment publicity caused by the arrests of the defendants, the release and subsequent serialization in a New Orleans newspaper of the 113-page affidavit that was the basis of the complaint, and the accidental release of several copies of the indictment in the present case two days before the grand jury returned a true bill on December 3, 1971. The defendants contend that this was a "government contrived scenario" that deprived them of receiving an unbiased grand jury determination. Even though the defendants have again neglected to allege any factual foundation of the actual effect of any publicity, the court has carefully considered the nature of the publicity involved and concludes that the defendants' motions are without merit.

That there was a great deal of publicity in the weeks following the arrest of the defendants on June 30, 1971, cannot be doubted, but this was due not to government impropriety but to the positions of some of the defendants and the nature of the case. It is important to recall that defendant Garrison was the District Attorney for the Parish of Orleans and that defendants Soule and Frey were members of the New Orleans Police Department at the time of their arrests. Federal charges that public officials conspired to obstruct local law enforcement by, *inter alia*, accepting bribes are certain to excite intense public interest and publicity in any community, and the news cannot be suppressed. The defendants cannot escape indictment, even in the face of widespread and unfavorable publicity, without proving actual prejudice because, if it were otherwise, "no one who is prominent and well known could be charged with the commission of any crime because the charge against such a person no doubt would cause very large and widespread adverse publicity, precluding an indictment." United States v. Hoffa, 205 F. Supp. 710, 717 (S.D.Fla.), appeal dismissed, 309 F.2d 680 (5th Cir.), cert. denied, 371 U.S. 892, 83 S.Ct. 188, 9 L. Ed.2d 125 (1962).

These defense motions must be denied because there is no factual foundation in the record or in the defendants' memoranda for the allegations of government impropriety or prejudice of the grand jurors. Concerning the former, there is nothing to indicate that the government breached the guidelines established by the judges of the Eastern District of Louisiana in their "Free Press-Fair Trial" order adopted on September 19, 1969. The defendants have presented no evidence to establish that the government incited publicity of the arrests. Nor is there anything in the record even tending to show that the government actually publicized the inadvertently released, unsigned copy of the indictment; indeed, the government contends in its memorandum that not only

was the release to members of the media accidental but the mistake was discovered immediately and all but one copy of the indictment were recovered shortly thereafter and prior to publication. Finally, the 113-page affidavit is a matter of public record, and, as such, its release is allowed under the guidelines of "Free Press-Fair Trial" referred to above. Concerning the alleged prejudice of the grand jurors, the mere fact that there has been pre-indictment publicity does not entitle the defendants to relief. The burden is on the defendants to allege and prove facts that show actual bias of the grand jurors, and, since the record is completely devoid of such a factual foundation, the defense motions must be denied. Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Martin v. Beto, 397 F.2d 741 (5th Cir. 1968); United States v. Osborn, 350 F. 2d 497 (6th Cir. 1965), aff'd, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); United States v. Hoffa, *supra*.

The final attack on the grand jury and its deliberations is raised primarily by defendants Lagarde and Pierce, who allege that there was insufficient direct evidence presented to the grand jury to support the charges against them. That there is no basis in law for this baseless claim is illustrated by the Supreme Court's language in Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956):

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

*See also* Lawn v. United States, 355 U.S. 339, 349–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). This court has already rejected, as without merit, the defendants' claims that the grand jury was biased and that the indictment is invalid on its face, and this claim must also fall. In summary, all defense motions for dismissal of the indictment on alleged grand jury defects are denied, as well as

all related requests for examinations of the jurors and of the minutes of the deliberations.

### Ex Post Facto Nature of § 1511

■ Defendants' remaining motion to dismiss argues that the indictment involves an ex post facto application of 18 U.S.C. § 1511, which became effective on October 15, 1970, in that it charges violation of that section "from on and *before* October 15, 1970 to on or about June 30, 1971." (Emphasis added.) Although the defendants are correct that no criminal liability attaches for acts committed before the effective date of the statute, the indictment may properly refer to a time prior to the effective date for the purpose of showing the existence of a continuing conspiracy. *See* United States v. Wechsler, 392 F.2d 344, 347 (4th Cir.), cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968); United States v. Kubacki, 237 F.Supp. 638, 643 (E.D.Pa.1965). The defendants' motion is, therefore, denied.

### II. MOTIONS FOR SEVERANCE

■ Seven of the defendants, Pierce, Boasberg, Marks, Callery, Nims, Frey, and Soule, have moved for severance of their trials pursuant to Rule 14, Federal Rules of Criminal Procedure, alleging that each is prejudiced by joinder with the other defendants in this one-count conspiracy indictment. As a first ground, these defendants contend that the mass of evidence to be presented at trial, some of which they claim would be inadmissible if the defendants were tried separately, will cumulate against them individually and will be especially prejudicial to those charged with smaller roles in the conspiracy. As another ground for severance, the defendants allege that their defenses will be antagonistic and that a joint trial will prevent them both from calling their codefendants to testify and from commenting on their codefendants' failure to testify.

■ It is axiomatic that the grant or denial of a motion for severance under Rule 14 is committed to the sound discretion of the trial judge. Opper v. United States, 348 U.S. 84, 93, 75 S.Ct. 158, 99 L.Ed. 101 (1953); United States v. Gray, 462 F.2d 164 (5th Cir. 1972); Gordon v. United States, 438 F.2d 858, 878–879 (5th Cir. 1971). And, after careful consideration of the defendants' arguments, I find that severance is clearly unwarranted in this case. The defendants have failed to demonstrate the likelihood of any prejudice that could not be avoided by cautionary instructions and that would outweigh the benefit afforded to efficient judicial administration by a single trial.

■ It is not enough for a defendant to allege that the evidence presented against his codefendants will tend to cumulate prejudicially against him. Tillman v. United States, 406 F.2d 930 (5th Cir.), cert. denied in part, vacated and remanded in part on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Nor is it enough for the movant to demand severance because he did not participate in the alleged crime as actively as did his codefendants. West v. United States, 311 F.2d 69, 70 (5th Cir. 1962). Indeed, the trial court can prevent any prejudice that could possibly arise from cumulation by aiding the jury, through cautionary instructions from the bench, in its task of distinguishing the evidence offered against individual defendants. United States v. Harris, 458 F.2d 670, 673 (5th Cir. 1972); *Gordon, supra,* 438 F.2d at 873–874; United States v. Kelly, 349 F.2d 720, 756–757 (2d Cir. 1965).

■ The defendants' second ground for severance, which involves the defenses and testimony of codefendants, is also without merit. The defendants, to compel severance, must do more than speculate; they must show a strong probability of prejudice from their inability to call their codefendants to testify in their behalf. *Tillman, supra,* 406 F.2d at 936; Garnett v. United States,

404 F.2d 26, 27 (5th Cir. 1968); Smith v. United States, 385 F.2d 34, 38 (5th Cir. 1967). And, since in the present case the defendants have not affirmatively shown that the codefendants would testify in a separate trial and that that testimony would tend to exculpate the movants, their allegations of prejudice are entirely speculative and, therefore, cannot provide a sufficient basis for severance under Rule 14. *Id.* Moreover, the defendants mistakenly rely on De Luna v. United States, 308 F.2d 140 (5th Cir. 1962), for the proposition that their allegations of conflicting defenses and of a *desire* to comment on a codefendant's failure to testify is sufficient to compel severance. In Gurleski v. United States, 405 F.2d 253, 264 (5th Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2127, 23 L.Ed.2d 765 (1969), the Fifth Circuit, holding that severance was unnecessary when counsel had no *duty* to comment, distinguished *De Luna*:

> "The principal case relied on . . . . [*De Luna*] involved a situation where the interest [*sic*] of the co-defendants were severely conflicting. The court noted the noncooperation between attorneys for the co-defendants and the attempts by each defendant throughout the trial to shift culpability to the other. The evidence in the instant case is to the contrary in that counsel for all defendants cooperated fully in urging the same objections and incorporating or joining common motions, pleas and points of errors. No defendant attempted to implicate only the other defendants. Thus, the telling consideration of *De Luna* is not present in this case."

*Gurleski* is controlling in this case because there are no conflicting interests, no mutually exclusive theories of guilt, and no evidence of noncooperation between the defendants. Defense counsel, therefore, will have no duty to comment on a codefendant's failure to testify, and severance is not required. *Accord,* United States v. Baggett, 455 F.2d 476, 477 (5th Cir. 1972); United States v. Wilson, 451 F.2d 209, 215 (5th Cir. 1971);

United States v. Hyde, 448 F.2d 815, 831 (5th Cir. 1971). Furthermore, to protect the defendants' right to remain silent this court will issue a pretrial order directing those defendants who choose to testify not to comment on the failure of a codefendant to do so.

Finally, this is not a complex securities or antitrust indictment involving an inordinately large number of defendants and counts or unusually esoteric issues of fact; rather, the one-count indictment simply charges the defendants with a single, continuing conspiracy. And, providing the government proves the existence of the charged conspiracy, the same evidence needed to convict one conspirator would be admissible against other defendants proven to have been members of the conspiracy. This being true, severance is particularly inappropriate in this case. *See* Milam v. United States, 322 F.2d 104, 110 (5th Cir. 1963), cert. denied, 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964). In summary, I can find no possibility of prejudice in the joint trial of these defendants and all motions seeking severance must be and are denied.

### III. MOTIONS TO SUPPRESS

Defendant Lagarde, joined by his codefendants, has moved to suppress the documents of TAC Amusement Co. that the government obtained pursuant to a subpoena duces tecum issued by the grand jury before the present indictment. The defendant argues that use of these documents of TAC, a Louisiana partnership in which Lagarde is a partner, violates his personal right against self-incrimination guaranteed by the Fifth Amendment. It should be noted at the outset that the same argument of Lagarde was rejected when he attempted to quash this subpoena after it was served on TAC in the course of the grand jury investigation.

In United States v. White, 322 U.S. 694, 700–701, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1944), the Supreme Court enunciated the policy underlying

the power to compel production of documents from any business enterprise:

> "Basically, the power to compel the production of the records of any organization, whether it be incorporated or not, arises out of the inherent and necessary power of the federal and state governments to enforce their laws, with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records."

This policy has been followed by two circuits, which have held that the subpoena of partnership records does not infringe on the personal rights of the partners against self-incrimination. In re Mal Brothers Contracting Co., 444 F.2d 615 (3d Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 106, 30 L.Ed.2d 99 (1971); United States v. Silverstein, 314 F.2d 789 (2d Cir.), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1963). Since the views of this court are in full accord with the rationale and policy of these cases, defendant Lagarde's motion to suppress must be denied. TAC is a substantial business enterprise, which, in fact, was organized as a corporation under the laws of Louisiana until September 1, 1967. This court's conclusion is also supported by Louisiana's entity theory of partnership, which clearly establishes the partnership as distinct from the partners composing it. See Smith v. McMicken, 3 La.Ann. 319, 322 (1848); Comment, Formation and Nature of Partnership, 45 Tul.L.Rev. 331, 347–352 (1971).

Defendant Boasberg has filed a motion to suppress all evidence of an interview between him and agents of the Federal Bureau of Investigation on January 26, 1972, nearly two months after the present indictment was returned. But, since the government has agreed not to use any information from the interview or obtained as a result of it, this motion to suppress is dismissed as moot.

## IV. DISCOVERY AND RELATED MOTIONS

### Jencks Act

 The defendants have moved for the production, within 10 to 30 days prior to trial, of all statements and grand jury testimony of prosecution witnesses. They cite the Jencks Act, 18 U. S.C. § 3500 (1970), as authority for their request, but, on a simple reading of the clear language of that act, these motions must be, and are, denied. The Jencks Act, whose provisions now unquestionably include statements made by a witness to a grand jury (18 U.S.C. § 3500(e)(3)), allows the defendant to compel production of statements in the possession of the government only "[a]fter a witness called by the United States has testified on direct examination . . . ." 18 U.S.C. § 3500(b) (emphasis added).

This case involves ten defendants, and, since it is probable that many witnesses will be called by the prosecution, examination of the statements in the possession of the government only after the direct examination would be likely to cause undue disruption and delay of the trial. To avoid this, the government has offered to produce the relevant statements or transcripts on the day before each prosecution witness testifies. I find that this offer is reasonable and that it will tend to eliminate any lengthy interruptions in the trial. I have no doubt that the government will honor its agreement but to avoid any possible misunderstanding, it is ordered that the relevant statements and transcripts of prior testimony of each prosecution witness be furnished to defense counsel the day before such witness testifies.

### Brady Material

 The defendants, relying on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), have also moved for the production prior to trial of all evidence in possession of the government that may be favorable to the

defendants, including the testimony of all witnesses before the grand jury.

First, the production of grand jury testimony is governed by the Jencks Act, discussed above, which expressly includes such testimony within its scope. 18 U.S.C. § 3500(e)(3) (1970). Second, *Brady* is not authority for pretrial discovery, much less the sweeping discovery requested by these defendants. *E. g.*, United States v. Moore, 439 F.2d 1107, 1108 (6th Cir. 1971); United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969). Indeed, the Fifth Circuit has just recently reemphasized the scope of production and inspection obliged by *Brady*:

> "Under *Brady* the government may not suppress evidence favorable to the accused, and under *Dutton* [Williams v. Dutton, 400 F.2d 797, 800 (5th Cir. 1968), cert. denied, 393 U.S. 1105, 89 S.Ct. 908, 21 L.Ed.2d 799 (1969)] the government has an 'affirmative duty . . . to produce at the appropriate time requested evidence which is materially favorable to the accused either as direct or impeaching evidence.' "

United States v. Harris, 458 F.2d 670, 675 (5th Cir. 1972). Thus, the government in this case will be required by due process to produce prior to trial all evidence that is *materially favorable* to the defendants. And, following the approach suggested in *Dutton, supra,* 400 F.2d at 800, this court will examine *in camera* any evidence whose materiality is questionable. But the defendants' present motions on the authority of *Brady* must be denied as totally without merit.

### Bills of Particulars

The defendants' motions for bills of particulars under Rule 7(f), Federal Rules of Criminal Procedure, are denied, because this court has already found that the indictment sufficiently apprises the defendants of the charges against them and enables them to prepare their defenses. Moreover, defendants' requests are really for evidential items that are more appropriately sought under Rule 16, Federal Rules of Criminal Procedure. The Fifth Circuit in considering the proper role of the bill of particulars has recently stated:

> "In federal prosecutions, the bill of particulars does not have the function of providing detailed disclosure of the government's evidence in advance of trial. All that is necessary is that the defendant be advised of any essential detail which may have been omitted from the indictment."

Dillen v. Wainwright, 449 F.2d 331, 332 (5th Cir. 1971). *Accord,* Overton v. United States, 403 F.2d 444, 446 (5th Cir. 1968); Wilkins v. United States, 376 F.2d 552, 563 (5th Cir.), cert. denied, 389 U.S. 964, 88 S.Ct. 342, 19 L. Ed.2d 379 (1967); Downing v. United States, 348 F.2d 594, 599 (5th Cir.), cert. denied, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965).

### Rule 16

Each of the defendants has filed a motion seeking discovery under Rule 16, Federal Rules of Criminal Procedure. The government has agreed to produce for inspection and copying the material listed in Rule 16(a), *viz.*, (1) the defendants' written or recorded statements in the possession, custody, or control of the government or which may become known to the attorneys for the government, (2) the results or reports of scientific tests or experiments performed in connection with this case, and (3) the recorded testimony of those defendants who appeared before the grand jury. The government has also agreed to provide for inspection and copying certain items covered by Rule 16(b), including all documents, books, papers, photographs, and objects in its possession, custody, or control that the government will offer as evidence at the trial of the case. To this extent the motions seeking discovery under Rule 16, Federal Rules of Criminal Procedure, are granted, and the government is ordered to

produce all of the material subject to production under such rule. It should be stressed, however, that this order does not extend to any internal government documents prepared by government agents in connection with this case or to any statements made by present or prospective government witnesses except as provided by the Jencks Act, 18 U.S.C. § 3500 (1970), discussed above. At this time the court denies the request of the government to invoke Rule 16(c) that would condition the defendants' discovery upon their reciprocal production of material for the government because the government has made no showing of the requisite materiality of the information to its own case.

One of the defendants' primary requests is for recordings of various conversations allegedly obtained through the consent of one of the parties but without the defendants' knowledge. The government has agreed to file in this court one complete set of tape recordings, and a verbatim transcript, of all electronic surveillance obtained in this case through the consent of one of the parties and containing the voice of any of the defendants. To ensure the defendants ample time for examination of these recorded conversations, it is ordered that the government file this material with the Clerk of Court not later than 30 days after the date of this order. And, to prevent any prejudicial pretrial publicity, it is further ordered that this evidence be and remain sealed until needed at trial, but that attorneys for the government and the defendants will be permitted access before trial.

 The defendants have moved to inspect the grand jury testimony and statements of past and present employees of the companies alleged in this case to be illegal gambling businesses. But these companies are not defendants in this case, and it is the corporate defendant alone that may request such discovery. *See* United States v. Zirpolo, 288 F.Supp. 993, 1021 (D.N.J.1968); United States v. American Oil Co., 286 F.Supp. 742, 753 (D.N.J.1968); United

States v. Aeroquip Corp., 41 F.R.D. 441, 446 (E.D.Mich.1966). Moreover, the government correctly argues that these are potential witnesses at the trial. For the above reasons, these defense motions are denied as without basis in law.

 The defendants' requests for the names, addresses, and prior criminal record of each witness the prosecution plans to call at trial are also denied. The denial of the list of witnesses is proper unless the defense counsel will be so prejudiced thereby that they will be rendered ineffective. United States v. Baggett, 455 F.2d 476, 477 (5th Cir. 1972). *Accord*, O'Neal v. United States, 411 F.2d 131, 138 (5th Cir.), cert. denied, 396 U.S. 827, 90 S.Ct. 72, 24 L. Ed.2d 77 (1969); Downing v. United States, 348 F.2d 594, 599 (5th Cir.), cert. denied, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). Defendants have shown no such prejudice. It follows that, if the defendants are not entitled to the list of prosecution witnesses, they have no right to demand the records of these witnesses' prior criminal convictions. But the government has agreed to disclose any convictions that are material to the issue of credibility and that the government has knowledge of.

 Finally, this court finds that the defendants' other motions for inspection under Rule 16 are neither material nor reasonable, and, accordingly, the motions are denied. Rule 16 is not a general, automatic discovery device; rather, it vests discretion in the trial court to grant discovery when materiality is shown.

## V. MISCELLANEOUS DEFENSE MOTIONS

 The defendants have moved this court to issue an order requiring that the government (1) affirm or deny the existence of any electronic or mechanical surveillance performed in connection with this case and (2) inquire as to similar surveillance conducted by other federal and state agencies. They correctly

cite Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) and Baker v. United States, 131 U.S. App.D.C. 7, 401 F.2d 958 (1968), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L. Ed.2d 384 (1970), as support for their request. Indeed, the government states that it has already requested all federal agencies involved in the investigation to state whether the defendants herein were subject to electronic surveillance, and it has agreed to submit the results of its inquiries to this court as soon as they are complete. But the government denies that any state or local agencies participated in any way in the investigation. The defendants' motions, therefore, are granted insofar as they concern electronic surveillance by federal agencies, and the prosecution is ordered to file its report with this court when it is completed; the defendants' motions concerning state or local agencies are denied.

■ The defendants' motions requesting inspection of certification by which the Special Grand Jury was impaneled pursuant to 18 U.S.C. § 3331 (1970) is granted, and the government is ordered to produce it for inspection by the defendants.

■ Defendant Boasberg has filed a motion for the special relief of a pretrial hearing to determine whether the prosecution intends to introduce evidence of any defendant's prior criminal convictions as impeachment and, if so, whether such evidence is admissible. This request is totally without merit, and, accordingly, the motion is denied. The defendants rely on Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965), which held that, under a statute applicable only to the District of Columbia, the trial judge could, at his discretion, exclude evidence of past criminal convictions used to impeach the defendant's testimony. The so-called *"Luck"* rule has never been accepted in this circuit, Bendelow v. United States, 418 F. 2d 42, 47–49 (5th Cir.), cert. denied, 400 U.S. 967, 91 S.Ct. 379, 27 L.Ed.2d 387 (1970), and it has been repudiated recently by the District of Columbia Court of Appeals. Dixon v. United States, 287 A.2d 89 (D.C.App.1972). Moreover, the defendant has alleged no extraordinary circumstances under which such special relief could be granted.

■ The defendants, through motions to strike portions of the indictment, pursuant to Rule 7(d), Federal Rules of Criminal Procedure, object to the caption of the indictment, to the official characterization of one of the government attorneys who signed it, and to the use of certain words describing the machines involved. I find that the caption of the indictment, which reads, "Indictment for Conspiracy to Obstruct State or Local Law Enforcement," contains nothing that could be considered inflammatory or prejudicial. Indeed, it merely describes the offense charged in the words of the applicable statute, 18 U.S.C. § 1511 (1970). The defendants' objection to the use of the words "gambling type" in the description of Bally pinball machines involved in this case is also without merit. A crucial element in a charge of violation of section 1511 is the proof of an "illegal gambling business," and, hence, the nature of the machines is a fact that will have to be proved by the prosecution at trial. Moreover, the government asserts that some pinball machines are not of the gambling genre.

■ The defendants' final objection to the wording of the indictment is to the characterization of one of its signers, John Wall, as "Attorney in Charge, New Orleans Strike Force, Department of Justice." This court agrees that in the interest of fairness this language should be changed, and, accordingly, it is ordered that the Clerk of Court delete part of the title description following the signature and name of John Wall at the conclusion of the indictment so that it will read "Attorney, Department of Justice." In summary, the motions to strike portions of the indictment are denied except as they relate to the characterization of John Wall in which case they are granted as ordered above.